**Opinion issued September 22, 2022**



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-20-00623-CV

———————————

**KARL J. AMELANG, AMELANG PARTNERS, AND EGN INVESTMENTS II, LP, Appellants**

**V.**

**HARRIS COUNTY APPRAISAL DISTRICT, Appellee**

---

**On Appeal from the 190th District Court**
**Harris County, Texas**
**Trial Court Case No. 2017-58211**

---

## O P I N I O N

Appellants Karl J. Amelang, Amelang Partners, and EGN Investments II, LP (collectively, Amelang) filed this tax-valuation protest against appellee Harris County Appraisal District (HCAD) pursuant to Texas Tax Code chapter 42. Amelang challenged HCAD's valuation of two properties—large buildings used as

warehouses and builder showrooms under a long-term master lease—for the 2017 and 2018 tax years. Following a bench trial, the trial court found Amelang's appraisal expert uncredible and rendered a take-nothing judgment on Amelang's claim of excessive valuation.

In five issues Amelang argues that the trial court (1) abused its discretion "when it failed to apply the controlling law and appraisal methodology that require an appraiser to consider the existence of a lease in a market value analysis"; (2) erred in concluding that Amelang bore the burden of proof at trial; (3) erred in finding that Amelang failed to meet its burden to establish the market value of the warehouses; (4) abused its discretion in making its credibility findings; and (5) erred in makings its findings of fact and conclusions of law on the issue of attorney's fees.

Because we conclude that Amelang failed to meet its burden of proof on its claim for excessive valuation, we affirm.

## Background

The properties at issue in this case are in Houston, Texas at 4235 Richmond and 4245 Richmond Avenue, near the intersection of Richmond and Drexel, just north of Highway 59. They are comprised of approximately four acres of land with two buildings totaling 210,000 square feet. The buildings, built in the 1970s, are currently used as warehouses or builder showrooms. They have been leased

consistently since 1985 and, at the time of trial, were subject to a long-term master lease. HCAD valued 4235 Richmond at $4,787,000 and 4245 Richmond at $11,125,000 on January 1, 2017, for the 2017 tax year. HCAD valued the properties at $4,780,945 and $11,192,685, respectively, on January 1, 2018, for the 2018 tax year.

Amelang protested the appraised values of the two properties for both the 2017 and 2018 tax years. *See* TEX. TAX CODE § 41.41(a) (authorizing property owner to protest property's appraised value before appraisal review board). The Appraisal Review Board (ARB) determined the protest by written order in favor of HCAD. *See id.* § 41.47(a) (requiring ARB to determine protest and make decision by written order). Amelang then filed for de novo judicial review of the ARB's determination. *See id.* § 42.01 (authorizing property owner to appeal order by ARB determining owner's protest under Chapter 41). Amelang filed an excessive appraisal claim as to both properties pursuant to Texas Tax Code chapter 42, asserting that the "assessed value assigned by [HCAD] on the Plaintiffs' property is grossly in excess of its actual fair market value."[1]

---

[1] Amelang also filed a claim that the valuations were not equal and uniform. *See Odyssey 2020 Acad., Inc. v. Galveston Cent. Appraisal Dist.*, 624 S.W.3d 535, 540 (Tex. 2021) (recognizing Texas Constitution's requirements that "[t]axation shall be equal and uniform" and stating that real and tangible personal property "shall be taxed in proportion to its value"); *EXLP Leasing, LLC v. Galveston Cent. Appraisal Dist.*, 554 S.W.3d 572, 576 (Tex. 2018) ("[A] property tax is equal and uniform only if it is in proportion to property value.") (internal quotations

3

At trial, Wellington "Rocky" Stevens, III, Amelang's asset manager for the properties in question, testified that both properties were leased to a single master tenant—Richmond RR, LLC—that in turn subleased portions of the properties to other tenants. Stevens generally explained the terms of the master lease, which was admitted into evidence, and he stated that the lease expires in 2023 but also had options to extend the term through 2038. Stevens testified that, because the long-term lease prevented Amelang or any subsequent purchaser of the properties from removing the buildings and redeveloping the lots for some other purpose, they constituted an "encumbrance" on the properties.

Stevens further testified that the properties are located adjacent to a railroad track and some high-voltage power lines that are a "negative" in terms of usability of the property. He also testified that there is inadequate parking to support using the properties for something other than warehouses or storage and that neighboring properties were "industrial" buildings. Stevens stated that, because the properties could continue to produce income under the master lease for 14-32 more years, the proper valuation method for establishing the market value of the properties was the income approach.

---

omitted); *see also* TEX. TAX CODE § 42.26 (providing that taxpayer is entitled to relief on ground that property is appraised unequally to its value). Amelang eventually dropped the equal-and-uniform claim and the trial court rendered judgment solely on the excessive-appraisal claim.

Amelang's expert Stevan Bach provided appraisal reports for both properties, noting that they were income-producing properties. Bach testified that he first considered the best approach to appraise the properties, discussing the three general approaches to determining the value of property: (1) the cost method; (2) the market data comparison, or comparable sales, method; and (3) the income method. Bach rejected using the cost approach—which relies on the cost of replacing the property—because the age of the buildings made it "difficult estimating all types of depreciation." He likewise rejected the comparable sales approach because "the sales that are out there in the marketplace" were too dissimilar to Amelang's properties. Bach determined it was best to value the properties using the income approach, which he felt was appropriate because the properties in question were subject to a lease that does not expire until 2023. However, Bach did not consider the master lease's rent terms, because they were below market rate. Bach considered instead the market rent, terms, and restrictions in appraising the properties.

Bach testified that, in reaching his valuation of the properties, he "did a highest and best use analysis." He determined that, "if it was land only, I said the highest and best use would be for mixed use, mid- to high-rise office or residential." But "because of the way it's improved [with the warehouses] and what market rent says with rent and term and all the others, it has an interim use

5

for highest and best use for the remaining life for 5 to 10 years of this structure." So, he concluded, because the warehouses still had approximately 5 to 10 years of useful life, his valuation was based on the income approach for the improved buildings.

Bach valued 4245 Richmond at $6,650,000 for January 1, 2017, and $5,100,000 for January 1, 2018. He valued 4235 Richmond at $3,850,000 for both tax years.

HCAD's expert, Gerald Teel, testified that he followed and applied the Uniform Standards of Professional Appraisal Practice (USPAP)—the same professional valuation standards outlined by Bach. Teel testified that HCAD retained him to determine the fair market value of the properties. To do so, he began by determining the highest and best use of the properties. He disagreed with Bach that the income approach was the correct method for determining the value of the properties:

> [I]f we're [appraising a] downtown high-rise office building, the income approach is the most applicable. There is no doubt about that.
>
> Now, when I get into a property that's 50 years old with inadequate parking, I've got a different activity analysis at that point because I don't know—then I've got to really test the market to see what can I lease it for. And I develop an income approach to see if it's worth X. But then when I look at the market value of the land, it's worth twice that. Well, the market value of the land is what I'm going to conclude is the highest and best use of that[.]

Teel further explained:

As far as the highest and best use in a fee simple analysis, I look at the land as if vacant. I look at that value. And then I do look at the income. But if that income does not produce the same net return capitalized, as we've talked about. If that's less of a value than what the vacant land is, then the ultimate decision is, that's a vacant land analysis. You use the sales comparison approach, and you go find comparables in that regard.

Regarding the Amelang properties at issue here, Teel testified:

[W]e looked at the income approach. And—and after you capitalize— the market rent, and Mr. Bach has done that too, it's just, I'm not sure where he came up with his vacant land sales because the analysis of the income at—Mr. Bach very well proves that the income approach is not applicable, or at least that is not the highest and best use of the land[.]

Teel testified that the improvements—warehouse-type buildings that were between 45 and 50 years old—were essentially at the end of their useful life:

[I]n this case, because of the low density of development and the escalation of land values within that Greenway Plaza area, the land value has certainly overtaken the ability to lease those improvements and get a fair rate of return. That's a business decision if you want to lease it. I don't have any argument with that. But from an appraisal standpoint and a fee simple market value, the land value is certainly much greater than potential income.

He looked at eight sales and "did a lot of research with brokers" to find comparable sales on which to base his valuation of Amelang's properties. He further testified that HCAD assessed the fee simple market value of the properties, and he stated that "a market lease at market occupancy on this property does not come close to the value of the land as if vacant." He considered the rent values as part of his highest and best use analysis in making this determination.

7

Teel opined that 4245 Richmond was valued at $10,820,000 for the 2017 tax year and at $11,400,000 for the 2018 tax year. He valued 4235 Richmond at $5,750,000 for the 2017 tax year and $6,060,000 for the 2018 tax year.

The trial court rendered a take-nothing judgment on Amelang's claim. The trial court found that Amelang bore the burden of proof and that it failed to meet this burden to establish the market value of either property for both the 2017 and 2018 tax years. The trial court determined that Amelang was not entitled to relief under Tax Code section 42.25. The trial court found that Stevens and Bach were not "credible" and that Amelang was not entitled to recover its attorney's fees.

**Appraisal Methodology**

In its first issue, Amelang complains that "[t]he trial court abused its discretion when it failed to apply the controlling law and appraisal methodology that require an appraiser to consider the existence of a lease in a market value analysis." In making this argument, Amelang fails to identify any specific ruling by the trial court that constituted an abuse of discretion; rather, Amelang asserts that the methodology that Teel used to appraise the property was not sound. Amelang also challenges the trial court's findings of fact and conclusions of law that Amelang had the burden of proof and did not meet its burden to establish the market value of the properties. Amelang argues that "the trial court rejected

8

controlling law on the valuation of a property with the existence of a lease" and thus abused its discretion.

Amelang's phrasing of this complaint—as being about the methodology used by an expert witness that can be reviewed for an abuse of discretion—implicates a challenge to the admissibility of HCAD's expert witness, Teel. HCAD observes, however, that Amelang did not raise a complaint regarding the admissibility of Teel's expert testimony, and we agree.

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an expert opinion if the expert's opinion testimony will help the factfinder to understand the evidence or to determine a fact in issue. TEX. R. EVID. 702; *see Reid Rd. Mun. Util. Dist. No. 2 v. Speedy Stop Food Stores, Ltd.*, 337 S.W.3d 846, 850–51 (Tex. 2011). Appraisal expertise is a form of "specialized knowledge [used to] assist the trier of fact to determine a fact in issue." *Guadalupe-Blanco River Auth. v. Kraft*, 77 S.W.3d 805, 807 (Tex. 2002) (quoting TEX. R. EVID. 702); *Harris Cnty. Appraisal Dist. v. Kempwood Plaza Ltd.*, 186 S.W.3d 155, 157 (Tex. App.—Houston [1st Dist.] 2006, no pet.). Expert appraisals are therefore subject to relevance and reliability requirements. *Kempwood Plaza*, 186 S.W.3d at 158 (citing *Gammill v. Jack Williams Chevrolet, Inc.*, 972 S.W.2d 713, 718–19 (Tex. 1998)).

When a party wishes to complain that expert testimony is unreliable because of the underlying methodology, technique, or foundational data used by the expert, it should challenge the admission of the testimony before trial or object when it is offered. *See Pike v. Tex. EMC Mgmt., LLC*, 610 S.W.3d 763, 786 (Tex. 2020) (citing *City of San Antonio v. Pollock*, 284 S.W.3d 809, 816–17 (Tex. 2009) and *Coastal Transp. Co. v. Crown Cent. Petroleum Corp.*, 136 S.W.3d 227, 233 (Tex. 2004)). Requiring an objection to preserve a complaint regarding the reliability of expert testimony allows the trial court the opportunity to conduct a reliability analysis, and it prevents trial by ambush and allows the proponent of the testimony an opportunity to cure any defect. *See Sw. Energy Prod. Co. v. Berry-Helfand*, 491 S.W.3d 699, 716 (Tex. 2016); *Pollock*, 284 S.W.3d at 816–17.

Even though "[e]xamination of an expert's underlying methodology is 'a task for the trial court in its role as gatekeeper, and [is] not an analysis that should be undertaken for the first time on appeal,'" incompetent evidence from an expert is legally insufficient to support a judgment, even if admitted without objection. *Gunn v. McCoy*, 554 S.W.3d 645, 661–62 (Tex. 2018) (quoting *Coastal Transp. Co.*, 136 S.W.3d at 233); *City of Keller v. Wilson*, 168 S.W.3d 802, 812 (Tex. 2005). Thus, a party may challenge conclusory or facially speculative opinions as legally insufficient to support a judgment even if the party did not object to admission of the testimony. *Pike*, 610 S.W.3d at 786; *Pollock*, 284 S.W.3d at 816.

The supreme court has held:

> When an expert opinion is admitted into evidence without objection, it may be considered probative evidence even if the basis for the opinion is unreliable. But if no basis for the opinion is offered, or the basis offered provides no support, the opinion is merely a conclusory statement and cannot be considered probative evidence, regardless of whether there is no objection. This is because the evidentiary value of expert testimony is derived from its basis, not from the mere fact that the expert has said it.

*Hous. Unlimited, Inc. Metal Processing v. Mel Acres Ranch*, 443 S.W.3d 820, 829 (Tex. 2014) (internal quotation marks and citations omitted).

Although Amelang complains on appeal about Teel's methodology for appraising the properties and asserts that the trial court abused its discretion, Amelang did not object to the underlying methodology used by Teel at trial. Thus, to the extent that Amelang argues that the trial court abused its discretion by allowing Teel's testimony due to problems with his underlying methodology for appraising the properties, it failed to preserve this complaint for appeal. *See Pike*, 610 S.W.3d at 786; *Pollock*, 284 S.W.3d at 816–17.

We observe, however, that both Teel's and Bach's expert testimony must nevertheless be competent to support the trial court's findings. *See Hous. Unlimited, Inc. Metal Processing*, 443 S.W.3d at 829. Thus, we construe the remainder of the complaints in Amelang's first issue—including the complaint that Teel's testimony was incompetent and, thus, could not support the trial court's findings in this case—as challenges to the sufficiency of the evidence.

11

Accordingly, we address those arguments in connection with Amelang's third and fourth issues below.

## Burden of Proof

In its second issue, Amelang argues that the trial court erred in concluding that it had the burden of proof at trial. Amelang filed a pre-trial brief arguing that HCAD had the burden of proof under Tax Code section 23.01(e), and it asserted the same argument in its motion for new trial. It argues that the trial court disregarded this authority in concluding that Amelang had the burden of proof.[2]

Amelang's argument on the burden of proof ignores the precedent of this Court. This Court has assigned the burden of proof to the taxpayer in tax appraisal suits. *Cypress Creek Fayridge, L.P. v. Harris Cnty. Appraisal Dist.*, No. 01-16-00003-CV, 2016 WL 7164032, at *4 (Tex. App.—Houston [1st Dist.] Dec. 8, 2016, no pet.) (mem. op.); *see Briggs Equip. Tr. v. Harris Cnty. Appraisal Dist.*, 294 S.W.3d 667, 670 (Tex. App.—Houston [1st Dist.] 2009, pet. denied) (taxpayer had burden to prove that market value of its inventory differed from district's appraisal); *Starflight 50, L.L.C. v. Harris Cnty. Appraisal Dist.*, 287 S.W.3d 741,

---

[2]  HCAD argues that Amelang failed to preserve this complaint. We observe, however, that Amelang requested findings of fact and conclusions of law and that Amelang's motion for new trial complained of the trial court's legal conclusion regarding the burden of proof. *See Grisel v. Everest Int'l, LLC*, No. 02-19-00401-CV, 2022 WL 714516, at *13 (Tex. App.—Fort Worth Mar. 10, 2022, pet. denied) (party preserves matter-of-law issue for appellate review by, among other methods, filing new-trial motion) (citing *T.O. Stanley Boot Co. v. Bank of El Paso*, 847 S.W.3d 218, 220 (Tex. 1992)).

745–46 (Tex. App.—Houston [1st Dist.] 2009, no pet.) (reciting test applicable when party with burden of proof challenges legal sufficiency in suit in which taxpayer appealed from trial court's adverse finding); *Pizzitola v. Galveston Cnty. Cent. Appraisal Dist.*, 808 S.W.2d 244, 246 (Tex. App.—Houston [1st Dist.] 1991, no writ) (same).

Amelang urges us to depart from this generally established rule, arguing that Tax Code section 23.01(e) places the burden on HCAD to establish the market value of the properties. We disagree with Amelang.

Section 23.01 governs "appraisals generally," and subsection (e) provides:

> Notwithstanding any provision of this subchapter to the contrary, if the appraised value of property in a tax year is lowered under Subtitle F, the appraised value of the property as finally determined under that subtitle is considered to be the appraised value of the property for that tax year. In the next tax year in which the property is appraised, the chief appraiser may not increase the appraised value of the property unless the increase by the chief appraiser is reasonably supported by clear and convincing evidence when all of the reliable and probative evidence in the record is considered as a whole. If the appraised value is finally determined in a protest under Section 41.41(a)(2) or an appeal under Section 42.26, the chief appraiser may satisfy the requirement to reasonably support by clear and convincing evidence an increase in the appraised value of the property in the next tax year in which the property is appraised by presenting evidence showing that the inequality in the appraisal of property has been corrected with regard to the properties that were considered in determining the value of the subject property. The burden of proof is on the chief appraiser to support an increase in the appraised value of property under the circumstances described by this subsection.

TEX. TAX CODE § 23.01(e).

13

Amelang argues that this section applies in this suit to shift the burden for establishing the fair market value of the properties to HCAD. Prior to filing this challenge of the 2017 and 2018 appraisals, Amelang protested the appraised values of the properties for the 2016 tax year and settled those values in an agreed final judgment. Amelang asserts that, under section 23.01(e), HCAD had the burden to support its increase in the appraised value of the properties for the 2017 tax year with clear and convincing evidence. *See id.*

Section 23.01(e) governs the obligations of the chief appraiser in making the initial appraisal. *See id.* But this proceeding is not based on the chief appraiser's initial appraisal, nor is the chief appraiser a proper party to this appeal. *See* TEX. TAX CODE § 42.21(b) (designating parties to petition for review of ARB's determination). Amelang challenged the appraisals before the ARB, pursuant to Tax Code chapter 41, and the ARB found in favor of HCAD. Amelang then pursued a de novo review of the ARB's determination pursuant to Tax Code chapter 42. Nothing in the language of section 23.01(e) purports to address the burden of proof in de novo proceedings pursuant to chapter 42.

To the contrary, section 42.23(a) provides, "Review [of the ARB's order] is by trial de novo. The district court shall try all issues of fact and law raised by the pleadings in the manner applicable to civil suits generally." TEX. TAX CODE § 42.23(a). Generally, in civil suits, the party seeking relief bears the burden of

proof. *See TRO-X, L.P. v. Anadarko Petroleum Corp.*, 548 S.W.3d 458, 464–65 (Tex. 2018) (noting "well accepted postulate of the common law" that civil litigant asserting affirmative claim for relief has burden of proof). And, as discussed above, this Court has held that the taxpayer has the burden to prove that the market value of its property differed from the taxing district's appraisal. *See, e.g.*, *Briggs Equip. Tr.*, 294 S.W.3d at 670.

We overrule Amelang's second issue.

## Sufficiency of Evidence

In its third issue, Amelang argues that the trial court erred in finding that Amelang "failed to meet its burden of proof on establishing the market value for its warehouses." In its fourth issue, Amelang argues that the trial court erred in finding that the testimony Amelang's expert and of its company representative was not credible. As part of its complaints regarding the sufficiency of the evidence, Amelang argues that the trial court failed to follow Texas law and other relevant authority regarding the proper valuations for the properties in that it disregarded the existence of Amelang's long-term lease.

## A. Standard of Review

When a party challenges the legal sufficiency of an adverse finding on an issue on which that party has the burden of proof, the party must demonstrate on appeal that the evidence establishes, as a matter of law, all vital facts in support of

the issue. *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 241 (Tex. 2001) (per curiam); *Aspenwood Apts. Partners, LP v. Harris Cnty. Appraisal Dist.*, No. 01-20-00335-CV, 2022 WL 1249956, at *8 (Tex. App.—Houston [1st Dist.] Apr. 28, 2022, no pet.) (mem. op.).

When a party challenges the factual sufficiency of an adverse finding on an issue on which that party has the burden of proof, the party "must demonstrate on appeal that the adverse finding is against the great weight and preponderance of the evidence." *Aspenwood Apts. Partners, LP*, 2022 WL 1249956, at *9 (citing *Nguyen v. Yovan*, 317 S.W.3d 261, 270 (Tex. App.—Houston [1st Dist.] 2009, pet. denied), and *Dow Chem.Co.*, 46 S.W.3d at 242). In reviewing a factual sufficiency challenge, we must "consider and weigh all of the evidence," and we may "set aside a verdict only if the evidence is so weak or if the finding is so against the great weight and preponderance of the evidence that it is clearly wrong and unjust." *Id.*; *see Crosstex N. Tex. Pipeline, L.P. v. Gardiner*, 505 S.W.3d 580, 615 (Tex. 2016).

**B.    Analysis**

Amelang challenges the trial court's finding that Amelang failed to establish the market value of the properties for the 2017 and 2018 tax years and, thus, failed to prove its right to relief pursuant to its excessive-appraisal claim. Amelang further complains about the trial court's findings that its expert, Bach, and property

16

manager Stevens were not credible witnesses. Because it had the burden of proof on its claim for excessive appraisal, Amelang must demonstrate on appeal that it established, as a matter of law, all the vital facts in support of its claim. *See Dow Chem. Co.*, 46 S.W.3d at 241.

Amelang was entitled to relief for excessive appraisal if it proved to the court "that the appraised value of property according to the appraisal roll exceeds the appraised value required by law." *See* TEX. TAX CODE § 42.25 ("If the court determines that the appraised value of property according to the appraisal roll exceeds the appraised value required by law, the property owner is entitled to a reduction of the appraised value on the appraisal roll to the appraised value determined by the court."). The law requires that the properties be appraised at their fair market value on January 1 of each tax year. *See id.* 23.01(a); *Cherokee Water Co. v. Gregg Cnty. Appraisal Dist.*, 801 S.W.2d 872, 877 (Tex. 1990) ("Appraised value according to law is fair market value."); *In re Valero Ref.—Tex., LP*, 415 S.W.3d 567, 571 (Tex. App.—Houston [1st Dist.] 2013, orig. proceeding). Thus, to prevail on its excessive-appraisal claim, Amelang had to prove the fair market value of the properties and then demonstrate that the value on HCAD's appraisal roll exceeds that fair market value. *See* TEX. TAX CODE § 42.25.

Market value is "the price the property will bring when offered for sale by one who desires to sell, but is not obligated to sell, and is bought by one who

17

desires to buy, but is under no necessity of buying." *City of Harlingen v. Estate of Sharboneau*, 48 S.W.3d 177, 182 (Tex. 2001). The Texas Tax Code defines "market value" as:

> the price at which a property would transfer for cash or its equivalent under prevailing market conditions if:
>
> (A) exposed for sale in the open market with a reasonable time for the seller to find a purchaser;
>
> (B) both the seller and the purchaser know of all the uses and purposes to which the property is adapted and for which it is capable of being used and of the enforceable restrictions on its use; and
>
> (C) both the seller and purchaser seek to maximize their gains and neither is in a position to take advantage of the exigencies of the other.

TEX. TAX CODE § 1.04(7).

The market value must be determined by applying "generally accepted appraisal methods and techniques" and by using the same or similar methods and techniques in appraising the same or similar kinds of property. *Id.* § 23.01(b); *Aspenwood Apts. Partners*, 2022 WL 1249956, at *9. The three accepted methods of determining the market value of property are (1) the market data comparison method, (2) the income method, and (3) the cost method. *EXLP Leasing, LLC v. Galveston Cent. Appraisal Dist.*, 554 S.W.3d 572, 577 (Tex. 2018) (citing TEX. TAX CODE §§ 23.011, .012, .013); *Key Energy Servs., LLC v. Shelby Cnty. Appraisal Dist.*, 428 S.W.3d 133, 143 (Tex. App.—Tyler 2014, pet. denied); *see* TEX. TAX CODE. § 23.0101 (providing that taxing entity determines market value

of property by considering "the cost, income, and market data comparison methods of appraisal and use[s] the most appropriate method"). The expert's valuation must also account for "basic marketplace realities." *Pike*, 610 S.W.3d at 789.

"Courts have long favored the comparable sales approach when determining the market value of real property." *Estate of Sharboneau*, 48 S.W.3d at 182. "If the goal of an appraisal is to ascertain market value, then logically there can be no better guide than the prices that willing buyers and sellers actually negotiate in the relevant market." *Id.* Under a comparable sales analysis, the appraiser finds data for sales of similar property, then makes upward or downward adjustments to these sales prices based on differences in the subject property. *Id.* Comparable sales must be voluntary and should take place near in time to the condemnation, occur in the vicinity of the condemned property, and involve land with similar characteristics. *Id.* Comparable sales need not be in the immediate vicinity of the subject land, so long as they meet the test of similarity. *Id.* But if the comparison is so attenuated that the appraiser and the fact-finder cannot make valid adjustments for these differences, a court should refuse to admit the sale as comparable. *Id.*

Amelang's expert, Bach, rejected the comparable sale approach, testifying in a conclusory manner that the comparable "sales that are out there in the

19

marketplace are lease fee going concern sales,"[3] or other sales that he believed were too different from Amelang's properties at issue here. Bach relied exclusively on the income approach to value the properties. *See id.* at 183 ("When comparable sales figures are lacking or the method is otherwise inadequate as a measure of fair market value, courts have accepted testimony based on the cost approach and the income approach.").

"The income approach consists of estimating the net operating income stream of a property and applying a capitalization rate to determine the property's present value." *State v. Bristol Hotel Asset Co.*, 293 S.W.3d 170, 172 (Tex. 2009) (per curiam). Generally, the use of the income approach "is appropriate when property would, in the open market, be priced according to the income that it already generates." *Estate of Sharboneau*, 48 S.W.3d at 183. "The income approach to value proceeds on the premise that a buyer of income-producing

---

[3]  *See, e.g.*, *Gregg Cnty. Appraisal Dist. v. Laidlaw Waste Sys., Inc.*, 907 S.W.2d 12, 18–20 (Tex. App.—Tyler 1995, writ denied) (discussing "leased fee approach" to income method of property valuation and describing this approach as involving "estimating future lease proceeds . . . , deducting appropriate expenses and then discounting the figures to the present worth"). Appraisal districts generally consider income generated from the use of land, but not from other assets such as "the use of capital, trucks, equipment, machinery, trained personnel, contracts, and business acumen." *Id.* at 20 (citing G.R. KARVEL AND P.J. PATCHIN (MAI appraisers), Land Appraisal Journal, October Issue, 1992 ("To the extent that business or going concern value exists, it should be recognized as a value separate and distinct from the value of the real property with which it is associated. . . . Common valuation errors and inclusion of business value may occur if the value of management and retail operations are not excluded when using the income . . . approach to value.")).

property is primarily interested in the income that his property will generate." *Key Energy Servs.*, 428 S.W.3d at 143.

Bach's reliance on the income method was based exclusively on the fact that the properties were currently improved with warehouses that had a "remaining life [of] 5 to 10 years." Bach recognized that Amelang's master lease rent terms were below market rate and, thus, not useful here. Bach considered instead the market rent, terms, and restrictions from comparable properties in appraising Amelang's properties.

Thus, Bach's testimony supports a conclusion that the properties here were not attractive to potential buyers for the income that the warehouses would generate, as is generally the case when property is valued using the income approach. *See id.* The warehouses were at the end of their useful life and currently leased at below-market rates. Bach testified that if the Amelang's properties did not contain the existing improvements—the warehouses—their best use would be for mid- or high-rise office or residential use, not for leasing out as warehouse space. Neither Bach nor any other witness for Amelang presented any evidence of the value of the properties under the comparable sale method.

Given the nature of Bach's testimony, relying solely on the income valuation method despite his testimony and other evidence indicating that the properties would not, in the open market, be priced according to the income that they already

generate, we cannot say that Amelang proved, as a matter of law, the vital facts of its excessive appraisal claim. *See Estate of Sharboneau*, 48 S.W.3d at 183 (discussing income approach to valuation); *see Dow Chem. Co.*, 46 S.W.3d at 241 (providing standard of review for challenges to sufficiency of the evidence).

Amelang nevertheless argues that, "under controlling appraisal methodology and applicable Texas law, an appraiser cannot ignore the existence of a lease." Amelang essentially argues that "Bach applied controlling law and appraisal methodology," and thus, the trial court erred in concluding that his testimony was not competent to prove the properties' fair market value. *See Gunn*, 554 S.W.3d at 661–62 (holding that incompetent evidence from expert is legally insufficient to support judgment, even if admitted without objection). Amelang cites numerous legal authorities to support the contention that the law required the trial court to consider the impact of the lease on the market value of the property. *See, e.g.*, TEX. TAX CODE § 23.01(b); *Key Energy Servs.*, 428 S.W.3d at 149 ("Each property should be appraised based on the individual characteristics that affect the property's market value."); *W. AH 406 Ltd. v. Cent. Appraisal Dist. of Taylor Cnty.*, 213 S.W.3d 544, 545–47 (Tex. App.—Eastland 2007, pet. denied).

Amelang is correct that the Tax Code requires appraisal districts to appraise property "based upon the individual characteristics that affect the property's market value." TEX. TAX CODE § 23.01(b); *Cypress Creek Fayridge, L.P.*, 2016

WL 7164032, at \*6. "This requirement, however, does not mandate reliance upon a specific type of data over any other type." *Cypress Creek Fayridge, L.P.*, 2016 WL 7164032, at \*6 (citing *W. AH 406 Ltd.*, 213 S.W.3d at 546–47 (requiring rent and occupancy restrictions to be taken into account), and *Haney v. Cooke Cnty. Tax Appraisal Dist.*, 782 S.W.2d 349, 351–52 (Tex. App.—Fort Worth 1989, no writ) (requiring structural damage to be taken into account)). None of the cases cited support Amelang's contention that the trial court was required to credit Bach's reliance on the income approach.

Rather, determining whether the terms of a particular lease is an individual characteristic that impacts the market value of the property is necessarily fact-specific and must be done on a case-by-case basis. *See* TEX. TAX CODE § 23.01(b) ("[E]ach property shall be appraised based upon the individual characteristics that affect the property's market value, and all available evidence that is specific to the value of the property shall be taken into account in determining the property's market value."). Amelang relies on *Western AH 406* to support its contention that the existence of the lease here compelled the trial court to credit Bach's valuation under the income approach. In *Western AH 406*, the court of appeals considered the effect on fair market value of an apartment complex subject to an agreement between the Air Force and Western that established the maximum amount of rent charged to Air Force personnel and restricted the occupancy of the apartment

23

complex, with priority being given to Air Force personnel. *W. AH 406*, 213 S.W.3d at 545.

The *Western* court concluded that the agreements between Western and the Air Force did need to be considered in valuing the property:

> [T]he agreements between Western and the Air Force are individual characteristics of the property to be considered in determining the market value of the property. Therefore, the trial court erred in ordering that the property be appraised without considering the agreements restricting the rent and occupancy of the property. . . . The trial court's final judgment determined the market value of the property based upon TCAD's appraisal that does not include the effect of the agreements between the Air Force and Western restricting rent and occupancy.

213 S.W.3d at 546–47.

But the *Western* court's conclusion does not require that all agreements or leases are individual characteristics that affect a property's fair market value. The *Western* court's determination was based on the particular agreements at issue in that case. *Id.* The court reached a different conclusion when faced with different facts. In *Land v. Palo Pinto Appraisal District*, the court concluded that specific lease terms were *not* individual characteristics affecting the valuation of property interests. 321 S.W.3d 722, 726 (Tex. App.—Eastland 2010, no pet.) (observing that trial court "heard uncontroverted evidence that, at least as of [the] date [of valuation], the market did not discount sales prices because of the remaining length of a lease or because of any other specific lease provision").

Here, the trial court heard conflicting evidence regarding the impact of the lease on the market value of the property. Stevens, Amelang's property manager, explained the terms of the master lease, testifying that the long-term lease prevented Amelang or any subsequent purchaser of the properties from removing the buildings and redeveloping the lots for some other purpose. Like Stevens, Bach determined that the income approach was the proper method for valuing the properties because the properties in question were subject to a lease that does not expire until 2023. He also testified that the lease currently in place for the properties was below market value, so he used other comparable market figures to determine the value of the properties. Thus, Bach did not provide any evidence regarding the impact that the lease would have on the market value on the comparable sales approach.

Teel, HCAD's expert, testified that he considered the nature of the improvements to the properties and the existence of the lease in making his determination of the highest and best use of the properties. He disagreed with Bach regarding the effect of the lease on the highest and best use analysis. Teel testified:

> [W]e looked at the income approach. And—and after you capitalize—the market rent, and Mr. Bach has done that too, it's just, I'm not sure where he came up with his vacant land sales because the analysis of the income at—Mr. Bach very well proves that the income approach is not applicable, or at least that is not the highest and best use of the land[.]

Teel testified that the improvements were essentially at the end of their useful life, and the increased property values in the area led him to conclude that appraising the value of the properties as vacant land was most appropriate:

> [I]n this case, because of the low density of development and the escalation of land values within that Greenway Plaza area, the land value has certainly overtaken the ability to lease those improvements and get a fair rate of return. That's a business decision if you want to lease it. I don't have any argument with that. But from an appraisal standpoint and a fee simple market value, the land value is certainly much greater than potential income.

Both Bach and Teel testified that they approached the appraisal using industry-standard methods and began with a highest-and-best use analysis. They both provided a basis for their opinions consisting of market research, but they reached different conclusions regarding the impact of the lease on the market value of the property. "Proof that one expert testified to the contrary of the opponent's expert is not proof that the opponent's methodology is flawed." *CBS Outdoor, Inc. v. Potter*, No. 01-11-00650-CV, 2013 WL 269091, at *14 (Tex. App.—Houston [1st Dist.] Jan. 24, 2013, pet. denied) (mem. op.). The trial court resolved the conflicting evidence from the experts by determining that Bach's testimony was not competent to establish the fair market value of the properties. Conflicts between the experts' testimony were left to the factfinder to resolve. *See id.*; *Creech v. Columbia Med. Ctr. of Las Colinas Subsidiary, L.P.*, 411 S.W.3d 1, 14–

15 (Tex. App.—Dallas 2013, no pet.) (holding that, when evidence presents "battle of the experts," appellate court defers to factfinder's resolution of conflicts).

Given the conflicting nature of the evidence, we conclude that Amelang failed to meet its burden in challenging the trial court's fact findings that Stevens and Bach failed to provide competent evidence to establish the fair market value of Amelang's properties.

And, as discussed above, none of the authorities cited by Amelang support its contention that the existence of its master lease here required an appraiser to use the income approach in determining the fair market value of the properties. Amelang argues that cases like *Enbridge Pipelines (E. Tx.) L.P. v. Avinger Timber, LLC*, 386 S.W.3d 256, 261 (Tex. 2012), holding that the existing use of land is presumed to be its highest and best use, compel a conclusion that the income approach is the only appropriate approach here. But neither *Enbridge* nor any of the other cases cited by Amelang support a conclusion that the fair market value of a property is limited by a taxpayer's use of the land. To the contrary, in determining a property's fair market value, the factfinder is not limited by the current use of the property—"the factfinder may consider the highest and best use to which the land taken can be adapted." *Exxon Pipeline Co. v. Zwahr*, 88 S.W.3d 623, 628 (Tex. 2002); *Morello v. Seaway Crude Pipeline Co.*, 585 S.W.3d 1, 30

(Tex. App.—Houston [1st Dist.] 2018, pet. denied) (holding same in context of determining fair market value for takings purposes).

Bach's own testimony indicated that, if the warehouses were removed from the property, the land would have a different and more valuable use as mid- or high-rise commercial or residential property. He relied, in part, on Amelang's business decisions about retaining the improvements and leasing the warehouses. However, fair market value is not determined based on the owner's own estimation of the value of the property or its business decisions. Fair market value is "the price the property will bring when offered for sale by one who desires to sell, but is not obligated to sell, and is bought by one who desires to buy, but is under no necessity of buying." *Estate of Sharboneau*, 48 S.W.3d at 182. This requires a consideration of "prevailing market conditions," including that "both the seller and the purchaser know of all the uses and purposes to which the property is adapted and for which it is capable of being used and of the enforceable restrictions on its use" and that "both the seller and purchaser seek to maximize their gains and neither is in a position to take advantage of the exigencies of the other." *See* TEX. TAX CODE § 1.04(7).

Even if we conclude that the *Enbridge* presumption—that the existing use of the land is its highest and best use—is applicable here, it is just a presumption. That presumption was rebutted by Teel's expert testimony that the "low density of

28

development and the escalation of land values within that Greenway Plaza area" caused the "land value [to overtake] the ability to lease those improvements and get a fair rate of return." Teel pointed out that Amelang's continued leasing of the properties was "a business decision" that did not affect the appraisal value, stating, "[F]rom an appraisal standpoint and a fee simple market value, the land value is certainly much greater than potential income."

Finally, Amelang challenges the basis of Teel's appraised value of the properties, citing concerns about the properties Teel identified as comparable sales. However, we need not address the sufficiency of Teel's expert testimony to establish a fair market value for this property. The trial court did not make a determination of Amelang's properties' fair market value. Rather, the trial court's findings in support of its judgment were that Amelang failed to meet its burden to prove that the fair market value of the properties was different than the value assigned by HCAD. The trial court did not render a judgment providing an appraisal amount based on Teel's claims. Instead, it denied Amelang's claim asking for relief for an excessive appraisal based on Amelang's own failure to demonstrate that HCAD's appraisal was excessive. The findings by the trial court do not implicate or rely on the comparable sales identified in Teel's expert report and testimony, and, thus, we do not address these complaints.

We overrule Amelang's third and fourth issues.

**Attorney's Fees**

In its fifth issue, Amelang argues that, if we reverse the judgment of the trial court on its first four issues, the trial court also "erred on its attorney's fees findings of fact and conclusions of law." Tax Code section 42.29 provides that a "property owner who prevails in an appeal to the court under Section 42.25 or 42.26 may be awarded reasonable attorney's fees." TEX. TAX CODE § 42.29(a). The trial court rendered a take-nothing judgment on Amelang's excessive-appraisal claim, and we have affirmed that judgment. Accordingly, Amelang was not a prevailing party on its claim pursuant to section 42.25 and, thus, is not entitled to attorney's fees. *See id.*

We overrule Amelang's fifth issue.

**Conclusion**

We affirm the trial court's take-nothing judgment on Amelang's excessive appraisal claim.


Richard Hightower
Justice

Panel consists of Justices Landau, Hightower, and Rivas-Molloy.